IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ERIC WALGREN,                          )
                                       )
          Plaintiff,                   )
                                       )        No. 12 C 6378
v.                                     )
                                       )        Magistrate Judge Schenkier
CAROLYN W. COLVIN, Acting              )
Commissioner of Social Security,[1]    )
                                       )
          Defendant.                   )

## MEMORANDUM OPINION AND ORDER[2]

Plaintiff Eric Walgren seeks reversal and remand of a determination by the
Commissioner of Social Security ("Commissioner") denying his Supplemental Security Income
("SSI") and Disability Insurance Benefits ("DIB") (doc. # 19).[3] The Commissioner, in turn, has
filed a motion seeking summary affirmance of that same determination (doc. # 29). For the
reasons set forth below, the Court grants Mr. Walgren's motion and denies the Commissioner's
motion.

## I.

We begin with the procedural history of this case. Mr. Walgren applied for benefits on
May 5, 2008, alleging a disability onset date of February 25, 2005 (R. 254-58). His claim was
denied initially and on reconsideration (R. 28). Plaintiff requested and received a hearing before

---

[1]Pursuant to Federal Rule of Civil Procedure 25(d), we have substituted Acting Commissioner of Social
Security, Carolyn W. Colvin, for Michael J. Astrue as the named defendant.

[2]On August 27, 2012, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1,
this case was assigned to this Court for all proceedings, including entry of final judgment (docs. ## 8-10).

[3]Mr. Walgren filed only a memorandum in support of his motion for remand, but no separate motion for
remand (R. 19).

an Administrative Law Judge ("ALJ"), which was held on September 21, 2010 (R. 109). On October 4, 2010, the ALJ issued an opinion denying benefits (R. 37).

Mr. Walgren requested an appeal and submitted additional evidence (R. 4). The Appeals Council granted Mr. Walgren's request for review, and on June 15, 2012, issued a decision revising the ALJ's opinion (*Id.*). The Appeals Council affirmed the ALJ's determination at Steps 1, 2, and 3, including the ALJ's credibility finding, and adopted the ALJ's ultimate conclusion that Mr. Walgren was not disabled (*Id.*). However, the Appeals Council revised the residual functional capacity ("RFC") determination of the ALJ (R. 4-5). When the Appeals Council reviews the ALJ's decision, the Appeals Council's decision is the final decision of the Commissioner and is therefore reviewable by the District Court under 42 U.S.C. § 405(g). *Rios v. Astrue*, No. 09 C 7348, 2010 WL 4736485, at *4 (N.D. Ill. Nov. 15, 2010) (citing *White v. Sullivan*, 965 F.2d 133, 136 (7th Cir. 1992)); *see also* 20 C.F.R. § 416.1481; *Schoenfeld v. Apfel*, 237 F.3d 788, 792 (7th Cir. 2001).

## II.

We turn to the Administrative Record. We review the general background and medical record in Part A, the hearing testimony in Part B, the ALJ's opinion in Part C, the additional evidence in Part D, and the Appeals Council's decision in Part E.

## A.

Mr. Walgren was born on June 26, 1974. He has a 12th grade education and lives with his parents (R. 32); he also has a child with his fiancée or girlfriend, Tracey Tooley. Mr. Walgren testified that sometime between 1996 and 2000, he got into an altercation during which he suffered a serious head injury (R. 114-15). Records from the Rush-Copley Medical Center emergency room show that he was treated for head trauma on March 10, 2003 (R. 71, 97). Mild

left frontal scalp soft tissue swelling was observed, but a CT scan of his brain showed no acute intracranial hemorrhage (*Id.*). Mr. Walgren was first treated for a convulsive seizure at Rush-Copley on October 13, 2003, at which time a physician proscribed Trileptal, an anti-seizure medication (R. 103).

Mr. Walgren worked as a Quality Assurance Inspector at HQC Precision Injection Molding from December 2001 until he was terminated on February 25, 2005, after experiencing seizures at work (R. 356, 105). Though Mr. Walgren's neurologist, Dr. Brian O'Shaughnessy, wrote a letter to Mr. Walgren's employer stating that he had "much better control of his seizure disorder" with new medication, Dr. O'Shaughnessy also stated that Mr. Walgren should not operate dangerous machinery because a loss of awareness could lead to serious injury (R. 103-05, 123). As Mr. Walgren worked in close proximity to such equipment, his employer terminated him (R. 105-06).

Mr. Walgren testified that after he was fired, he lost his medical insurance and could no longer afford to see Dr. O'Shaughnessy (R. 149). He missed three appointments with Dr. O'Shaughnessy in April 2005, May 2006, and June 2006 (R. 373). On May 15, 2006, Mr. Walgren was taken by ambulance to Provena Mercy Center after Ms. Tooley witnessed him having a seizure (R. 396). Ms. Tooley stated that his last seizure had been three weeks prior (R. 397-99). An emergency room nurse, Pamela Johnson, observed multiple 20-30 second "episodes" in which Plaintiff was confused as to where he was, sat in a contracted position, smacked his lips, and twitched (R. 400). A blood test during that visit showed cocaine and marijuana in Mr. Walgren's system (R. 402, 409).

On December 19, 2006, Mr. Walgren consulted with a neurologist, Dr. Boris Vern (R. 386). Mr. Walgren described "having spells, characterized by deja-vu, a feeling of psychic

energy, or auditory hallucination (voices)," which sometimes progress to generalized convulsions (*Id.*). He reported being initially treated with Dilantin, then being switched to Depakote to avoid side effects, and eventually being switched again to Keppra and Trileptal (*Id.*). Mr. Walgren stated that he had no auras or seizures with those medications for six months, but Keppra made him nervous and irritable and impaired his attention (R. 386-87). Dr. Vern noted that a recent EEG showed left frontal slowing, but a brain MRI was normal (R. 386). He diagnosed Mr. Walgren with partial complex seizures with generalization, meaning that Mr. Walgren occasionally experienced convulsive seizures, but primarily experienced partial complex seizures, or spells (R. 389). Dr. Vern prescribed an additional medication, Lamictal (*Id.*).

Mr. Walgren's symptoms varied over time as his medications were adjusted. In May 2007, Dr. Vern noted that Mr. Walgren's last convulsive seizure was one year ago, and his last partial seizure occurred two months prior (R. 379-83). An EEG from August 2007 was "essentially unremarkable," with no "epileptiform activity or sharp transients" or "focal slowness" (R. 412). At the time, Mr. Walgren was on Lamictal, Trileptal, and Keppra. However, because Keppra caused Mr. Walgren to be extremely angry and aggressive, Dr. Vern lowered his dosage initially from 1000 milligrams to 750 milligrams, and then to 250 milligrams in November 2007 after Mr. Walgren reported persistent feelings of anger and aggression (R. 379). Dr. Vern also increased his dosage of Lamictal and maintained his dosage of Trileptal (R. 380). That month, his neurologist noted that Mr. Walgren had at least two spells since his last visit, which Mr. Walgren described as an altered consciousness which lasted a few minutes and left him confused (*Id.*).

On April 2, 2008, upon noting that Mr. Walgren had two convulsive seizures since his Keppra dose was lowered to 250 milligrams, Dr. Vern increased the dosage to 500 milligrams (R. 377). At 500 milligrams, Mr. Walgren did not feel the anger that he felt at the 1000 milligram dose of Keppra, but still experienced a few complex partial spells (*Id.*).

In June 2008, Mr. Walgren's primary care physician, Dr. Brian Becker, reported that Mr. Walgren showed signs of depression and anxiety (R. 423-25). Mr. Walgren was isolating himself in his room at his parents' house to avoid interacting with people, and he had a hostile and aggressive attitude toward others (*Id.*). Dr. Becker noted that he would try to find a psychologist who would evaluate Mr. Walgren despite his lack of insurance.

On July 17, 2008, Dr. Vern reported that Mr. Walgren's complex partial epilepsy was "now presenting with frequent breakthrough seizures," *i.e.* "spacing out," and he had episodes of anger outbursts and anxiety around other people (R. 608). Dr. Vern increased Mr. Walgren's prescription for Lamictal (a mood stabilizer) from 200 to 300 milligrams and decreased his dosage of Keppra from 500 to 250 milligrams (R. 609). Dr. Vern advised Mr. Walgren that if his seizures resumed at the current or higher frequency he should increase the Keppra back to 500 milligrams (*Id.*).

On August 19, 2008, Dr. Barbara Sherman, a clinical psychologist, evaluated Mr. Walgren at the request of the Bureau of Disability Determination Services ("DDS"). Mr. Walgren stated that he was afraid to be with people except for his girlfriend and some relatives, and he feels angry at everyone (R. 451-52). He reported being anxious and crying easily, and he could not sustain concentration to read (R. 452). Dr. Sherman observed that Mr. Walgren was cooperative and generally coherent, and he had adequate immediate and remote memory (R. 452-54). However, he had diminished focus, was not fully oriented to place, and had impaired

sustained concentration and judgment (*Id.*). Dr. Sherman also noted some vegetative signs of clinical depression and social anxiety (R. 454). She diagnosed him with Intermittent Explosive Disorder, Alcohol Abuse (in remission), Social Phobia, Cognitive Disorder NOS, Mood Disorder due to medical condition with anxiety and depressed mood, and "Traumatic Brain Injury with Seizure Disorder" (R. 453-54).

On the same day, Dr. Roopa Kerri conducted an internal medicine consultative examination of Mr. Walgren at the request of DDS (R. 457). Mr. Walgren reported that his last seizure, two days ago, was minor (*i.e.*, a spell), and that he gets those 3 to 4 times a week (*Id.*). His last major grand mal seizure had been 2 months earlier, and it had caused him to fall from a toilet (R. 458). He reported that Keppra works best to control his seizures, but the side effects – hostility – are bad (*Id.*). On August 29, 2008, Ms. Tooley reported that Mr. Walgren had petit mal seizures twice a week and grand mal seizures often, but not in the last two months (R. 320-21).

On September 5, 2008, based on the medical records, Phyllis Brister, PhD, completed a psychiatric assessment and mental RFC opinion for DDS. She determined that Mr. Walgren had non-severe impairments related to Listings 12.02 (cognitive disorder), 12.04 (affective disorder), 12.06 (anxiety related disorder), 12.08 (personality disorder), and 12.09 (substance addiction disorder) (R. 461-69). Dr. Brister found that Mr. Walgren had: mild restrictions of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation of extended duration (R. 471). Further, she opined that Mr. Walgren was moderately limited in his ability to understand, remember, and carry out detailed instructions; to work in coordination with or proximity to others without distraction; and to interact appropriately with the general public (R.

6

475-76). She found no limitation in his ability to accept, understand, recall, and execute simple operations of a routine, repetitive nature and to respond appropriately to criticism from supervisors (R. 476-77). Dr. Brister opined that Mr. Walgren would do best in a socially undemanding and restricted setting (R. 477). She found Mr. Walgren only partially credible because he made inconsistent statements relating to his history and impairments (R. 472).

On September 10, 2008, Dr. Ernst Bone completed a physical RFC assessment of Mr. Walgren for DDS (R. 479). He found that Mr. Walgren had no exertional, manipulative, visual, or communicative limitations, but was limited to occasionally climbing ramps/stairs and to avoiding concentrated exposure to hazards such as machinery and heights (R. 480-83). Dr. Bone found that Mr. Walgren's seizures were only partially controlled with medication, and he was trying to stabilize his seizures (R. 486).

Mr. Walgren saw Dr. Vern again in November 2008. Dr. Vern opined that "[t]he frequency of absence spells (*i.e.*, partial seizures) ha[d] decreased since the increase in Lamictal dose," from 200 to 300 milligrams, and Mr. Walgren's mood had improved since the Keppra was decreased, despite a remaining "tendency to be intrusive or garrulous" (R. 606). Dr. Vern advised Mr. Walgren to decrease his dosage of Keppra to 250 milligrams for one month and then discontinue it completely (R. 607). However, Dr. Vern stated that if Mr. Walgren's seizure frequency increases, he should restart Keppra at 250 milligrams (*Id.*).

On January 21, 2009, Dr. Vern reported that "[t]he frequency of absence spells . . . increased since the increase in Lamictal dose," but Mr. Walgren had better convulsive seizure control and no convulsions since November 2008 (R. 611-12). Later that month, after reviewing Mr. Walgren's updated medical evidence, DDS doctors affirmed the physical and mental RFC determinations for Mr. Walgren (R. 499-501).

On May 13, 2009, a note from a neurologist indicated that Mr. Walgren was hospitalized two weeks earlier for a convulsive seizure (R. 613). In addition, the frequency of his staring spells was up to two times per week (*Id.*). Though his mood was improved since he stopped taking Keppra, Mr. Walgren had more trouble focusing and more nausea with an increased dose of Lamictal (*Id.*).

On August 28, 2009, Dr. Vern completed a seizures RFC questionnaire for Mr. Walgren. He opined that Mr. Walgren had complex partial seizures 2 to 3 times a month, the most recent ones occurring on July 1 and 15, 2009, and August 1, 2009, which were triggered by stress and social anxiety (R. 502). The seizures resulted in loss of consciousness, confusion, exhaustion, paranoia, irritability, severe headache, and auditory hallucinations (R. 502-03). Dr. Vern recorded that Mr. Walgren was compliant in taking therapeutic levels of Lamictal and Topamax, but they caused certain side-effects including dizziness, coordination disturbance, and lack of alertness (R. 503). He opined that Mr. Walgren's seizures would likely disrupt co-workers, and he would need additional supervision and an unspecified number of unscheduled breaks, but that he was capable of low stress jobs (R. 504). Dr. Vern noted that there were no other limitations related to drug/alcohol abuse (R. 504-05).

In August 2009 and January 2010, Dr. Vern reported that Mr. Walgren's convulsive seizures were controlled ("effectively stopped") with Trileptal and Lamictal, but that he was still having complex partial seizures that were socially embarrassing (including peculiar facial expressions and gestures) and at times were associated with anger and rage behavior (without bodily harm) (R. 604, 616). Dr. Vern further noted that the addition of Topamax caused no side effects, and if anything, made Mr. Walgren feel more relaxed (*Id.*). In June 2010, Mr. Walgren had an EEG, which was "mildly abnormal . . . suggestive of a low threshold seizure disorder" (R.

512). Mr. Walgren visited a psychiatrist, Dr. Baslet, for the first time in July 2010 (R. 113). Dr. Baslet prescribed Zoloft (R. 124). Mr. Walgren's next appointment with Dr. Baslet was scheduled for the week after the hearing (R. 117).

On September 5, 2010, Mr. Walgren's mother wrote that her son was still afraid to talk to people and usually stayed in his bedroom (R. 359). She or her husband supervised when Mr. Walgren's son visited because he lost his temper easily and she worried he might have a seizure (*Id.*). She wrote that her son had seizures or spells when he was nervous or upset, and afterward did not remember anything (R. 360).

**B.**

At the hearing before the ALJ on September 21, 2010, Mr. Walgren testified that he gets partial seizures, or "spells," about three to four times a week, which are usually triggered by stress, anger, or panic (R. 117-19). The spells last three to five minutes, and afterward he is confused and tired (*Id.*). His last partial seizure was the day before the hearing, and his last convulsive seizure was on September 9, 2010, when he hit his head and bit his tongue (R. 114). He did not seek medical care at that time (*Id.*).

Mr. Walgren becomes very stressed and anxious when he is around other people, so he spends most of his time in the house and only socializes with his parents and some other family members (R. 119-20). He also has difficulty controlling his anger, and he has angry outbursts three to four times a week (R. 120, 125-26). Mr. Walgren will occasionally shop with his mother or get fast-food with his parents or fiancée (R. 129-30).

Mr. Walgren takes Lamictal, Trileptal, and Topamax for seizures; Metoprolol, Norvasc, and Hydrochlorothiazide for high blood pressure; and Zoloft for social anxiety (R. 112-13). The medications do not always control his seizures (R. 121). His seizures were best controlled with

Keppra, but it caused him to be very angry and aggressive, so he stopped taking it (R. 119-20, 152). Topamax makes him confused (R. 121). He testified that he has not used any kind of street drugs like marijuana or cocaine since 2006 (R. 115-16).

Dr. Kravitz, a psychological expert, testified next. Based on Mr. Walgren's testimony and the medical record, Dr. Kravitz evaluated his explosive disorder, social phobia or cognitive disorder, mood disorder due to his medical condition, anxiety, depression, and substance abuse (R. 133). Dr. Kravitz opined that Mr. Walgren's mental impairments may stem from medication side effects or the effects of his seizure disorder (R. 134-35). Dr. Kravitz found mild to moderate limitations in activities of daily living; moderate limitations in social functioning; moderate restrictions in concentration, pace, and persistence; and no clear episodes of decompensation (R. 135). Dr. Kravitz did not find a marked level of impairment in social functioning because Mr. Walgren showed some ability to socially engage, both at the hearing and in his testimony that he occasionally eats at restaurants (R. 138).

Dr. Kravitz opined that Mr. Walgren should be limited to jobs with low stress (no high production goals), repetitiveness, and routine, and to carrying out short, simple instructions (R. 135-36). In addition, he should be limited to "brief and superficial workplace contacts," "incidental contact with the public," and limited contact with supervisors (no more than once per hour with no micromanaging) (R. 136). However, Dr. Kravitz questioned whether Mr. Walgren could handle such work on a sustained or extended basis: that depended on Mr. Walgren's credibility because "there really isn't very much psych evidence" (R. 136, 141).

Dr. McKenna, board certified in internal medicine and pulmonary disease, testified next. Like Dr. Kravitz, he did not personally examine Mr. Walgren, but based his medical opinion on Plaintiff's testimony and a review of the medical record (R. 142-43). Dr. McKenna stated there

were "troubling differences" in Mr. Walgren's testimony as to the date his seizures started and the circumstances of his initial head trauma (R. 143-45, 155-56).[4] Dr. McKenna also found that Mr. Walgren was "a little deficient" in therapeutic compliance based on inconclusive early lab studies due to his use of seizurogenic drugs and little documentation of compliance after 2008 (R. 158). He found no evidence of brain trauma on MRI or other imaging studies and no evidence of a seizure disorder on EEGs (R. 155-56).

Dr. McKenna described this as a "really awkward situation, because we really do not have any solid evidence that [Mr. Walgren] is actually having physical seizures" (R. 155). Furthermore, Dr. McKenna had "real problems with the idea that he has bona fide seizures, because the onset was very long after the injury," which Dr. McKenna described as "relatively minor" (R. 156).

Dr. McKenna opined that "the seizures are affected by, brought on somewhat by emotions and by stress, and as a result of it, he appears to be excused from social pressures and things like, so it has all the hallmarks of a pseudo seizures, in that he has social gains when he has these seizures, and everybody's expectations for him drop dramatically in terms of what they expect from him" (R. 156). Dr. McKenna hypothesized that the seizures began when Mr. Walgren was at work because "he was having problems, interpersonal problems at work, and he was in a pressure cooker kind of situation, so the seizures would provide an out from that. . . . [T]hat was a typical kind of situation where the psychogenic seizure would be of benefit to him.

---

[4]The parties do not dispute that Mr. Walgren suffered a head injury. Dr. McKenna pointed out, however, that Mr. Walgren has been inconsistent in describing when and how that injury occurred, and how soon after the injury his seizures began. Dr. McKenna noted that while Mr. Walgren testified that his seizures began in 2003, he reported to his neurologist in 2006 that his seizures began a year earlier, and he reported to the consultative examiner in 2008 that the seizures began "four years ago" (R. 144). Dr. McKenna then asked Mr. Walgren why he sometimes described being hit with a metal object, and other times with a club or baseball bat; Mr. Walgren explained that he was hit with a tire-knocker, which is metal, but covered with wood (R. 144-45).

It would kind of get him, it would get him out of there, and out of the awkward situations, you know" (R. 162).

Dr. McKenna did not define the term "pseudo seizures," but he stated that "if [Mr. Walgren] is having pseudo seizures and not real seizures, then that's not a severe physical impairment. It would become a mental impairment" (R. 158). Since he did not have "real seizures," Dr. McKenna opined that Mr. Walgren did not need restrictions on heights or other dangerous activities in his RFC (R. 159). The ALJ questioned him on this RFC issue, asking if even with pseudo seizures a person could be at risk if working at heights (*Id.*). Dr. McKenna responded that: "[w]ith pseudo seizures, . . . [t]hey don't injure themselves, because they do the dying swan routine and gently to the floor and make sure they don't injure themselves" (R. 159-60). Dr. McKenna described this as "almost one of the hallmarks of pseudo seizures rather than seizures" (*Id.*). Dr. McKenna believed that anti-seizure drugs such as Keppra, which are sedating, may help with anxiety problems that lead to pseudo seizures (R. 161-62).

The VE testified next that Mr. Walgren's past relevant work was as a lab technician, semi-skilled and light, and as a quality assurance person for injection molding of plastics, semi-skilled and medium (R. 164). The ALJ asked the VE to consider the limitations set by Dr. Kravitz: short, simple instructions; brief, superficial contact at the workplace with co-workers; only incidental public contact; contact with supervisors no more than once per hour with no micromanaging; and limited to routine work stresses without high production goals (*Id.*). The VE testified that these limitations would eliminate Mr. Walgren's prior work; however, light, unskilled SVP 2 jobs such as housekeeping, mail room clerk, and office helper would be available (R. 165). The VE reduced the Dictionary of Occupational Titles ("DOT") numbers for these positions to 3,200, 6,000, and 2,100 respectively, to include only "after hour type" jobs to

12

minimize contact with others (R. 166-67). Because the DOT does not discuss many non-exertional types of limitations, the VE made the downward adjustment not using a formula, but based on her "experience in analyzing these jobs and pleasing people and deciding [which] jobs would be appropriate and what types of jobs wouldn't be appropriate" (R. 165-67). For these jobs, a worker would have to be on task at least 85 percent of the time, with no more than one absence per month (*Id.*).

## C.

In his opinion, dated October 4, 2010, the ALJ found that Mr. Walgren was not disabled from the alleged onset date of February 25, 2005, through the date of the decision. The ALJ evaluated him under the five-step sequential process detailed in 20 C.F.R. § 404.1520. At Step 1, the ALJ found the plaintiff had not engaged in substantial gainful activity since February 25, 2005 (R. 30). At Step 2, he found the following severe impairments: a pseudo seizure disorder, a history of substance abuse, an explosive disorder, depression, and anxiety (*Id.*). The ALJ found that Mr. Walgren had not alleged that he had "any severe physical impairments" (R. 34).

At Step 3, the ALJ found Mr. Walgren did not have any impairment or combination of impairments that meet or medically equal a listed impairment (R. 31). The ALJ stated that the claimant's pseudo seizure disorder "does not meet or medically equal the requirements of any listed impairments in Appendix 1" (*Id.*). As for his mental impairments, the ALJ found Listings 12.02, 12.04, 12.06, 12.08, and 12.09 were not met (*Id.*). The ALJ found that Mr. Walgren had mild restrictions in activities of daily living; moderate difficulties in social functioning; moderate difficulties in concentration, persistence or pace; and no episodes of decompensation (*Id.*). Thus, the "paragraph B" criteria were not satisfied (*Id.*).

The ALJ determined that Mr. Walgren had an RFC to perform light work, except that he was "limited to simple, unskilled work with limited contact with the public, co-workers and supervisors and [wa]s precluded from working around dangerous machinery or unprotected heights" (R. 31). The ALJ relied heavily on Dr. McKenna's testimony regarding Mr. Walgren's "alleged seizures," including Dr. McKenna's finding of "numerous discrepancies" in the frequency and description of Mr. Walgren's seizures and his compliance with treatment and medication (R. 33). In addition, Dr. McKenna found "no solid reports of witnessed seizures," no medical evidence from Mr. Walgren's initial head trauma, and no EEG evidence of seizure disorder (*Id.*). The ALJ noted that Dr. McKenna testified that the "alleged seizure disorder" did not meet or medically equal the requirements of Listings 11.02 or 11.03 for epilepsy (*Id.*).

The ALJ found that Dr. McKenna's testimony was supported by evidence in the record (R. 33). The ALJ noted that hospital discharge papers from October 2003 included instructions for seizures, and a May 2006 hospital report indicated that Mr. Walgren was treated for a possible seizure and tested positive for cocaine and marijuana (*Id.*). The ALJ also stated that Mr. Walgren had been "receiving treatment for a 'complex partial seizure disorder' for many years" (*Id.*). Nonetheless, the ALJ found that "the record does not document that the claimant has been hospitalized for the treatment of these alleged seizures," and the ALJ found that no medical professional or third party – including his fiancée and mother – had witnessed the severity of his seizures (*Id.*). The ALJ cited doctors' notes between December 2006 and April 2008, in which Mr. Walgren's physical examinations were reported as normal, and from May 2006 to May 2007, in which Mr. Walgren was described as seizure-free (*Id.*). The ALJ also noted that an EEG from June 29, 2010, found mild abnormality, indicative of low threshold seizure disorder (R. 34).

The ALJ did not find persuasive Dr. Becker's July 24, 2008 note stating, without explanation, that Mr. Walgren was disabled (R. 34). The ALJ noted that at various appointments with Dr. Becker in 2008, Mr. Walgren did not complain of seizures, but at times chiefly complained of hypertension or hostility and aggression (*Id.*). Mr. Walgren also admitted to Dr. Becker that he used alcohol occasionally (*Id.*).

The ALJ then briefly discussed Dr. Vern's treatment of Mr. Walgren. Initially, the ALJ disputed Dr. Vern's statement that he began treating Mr. Walgren in 2006 (R. 34). Instead, the ALJ stated that Dr. Vern treated Mr. Walgren from 2008 to 2010, and that "the sporadic treatment notes" from that time period showed normal physical examinations (*Id.*). The ALJ noted that in Dr. Vern's August 28, 2009 RFC opinion, he stated that Mr. Walgren had two to three seizures a month with loss of consciousness and his medications were tested at therapeutic levels, but Dr. Vern did not indicate that he had witnessed any seizures (*Id.*). Further, on January 12, 2010, Dr. Vern noted that Mr. Walgren's convulsions had stopped, but that he still had "socially embarrassing" complex partial seizures (*Id.*).

The ALJ listed several reasons for finding Mr. Walgren "not fully credible" as to his allegation that he cannot work due to his "partial seizures," where he "spaces out" for periods of time (the ALJ stated that "[i]t is not alleged that he has convulsive type of seizures") (R. 35). *First*, while Mr. Walgren stated that he was drug-free, he tested positive for cocaine and marijuana in 2006, continued to drink alcohol, and was seeking treatment from the "Gateway Foundation," which the ALJ stated treats substance abuse (R. 34-35). *Second*, Mr. Walgren had non-therapeutic levels of his seizure medications when tested (*Id.*). *Third*, his description of his alleged head trauma and the onset date of his seizures varied (*Id.*). Thus, the ALJ concluded that "[a]ll of these contradictions together with the fact that there is no single incident of a witnessed

seizure in the record belies the claimant's overall credibility" (*Id.*). In addition, the ALJ found

that these reasons "diminish[ed] the weight which can be afforded to the opinion evidence from

Drs. Becker and Vern" (*Id.*).

As for Mr. Walgren's allegations of depression, anxiety, and anger issues, the ALJ relied

on Dr. Kravitz's testimony that Mr. Walgren had only mild to moderate limitations in the

paragraph B criteria, and that he should have limited contact with the public, co-workers, and

supervisors (R. 32). The ALJ noted that Mr. Walgren had never been hospitalized for mental

illness, his psychiatric appointments were "very sporadic," and he is not taking any medications

for mental illness (R. 35). In addition, he has a fiancée and a child whom he sees often (R. 36).

Further, the ALJ found that there was no treating opinion evidence in the record stating that Mr.

Walgren was significantly limited due to his alleged mental disorders (R. 35-36).

The ALJ next found that Mr. Walgren had no past relevant work, and that he could only

perform a limited range of light work (R. 36). The ALJ determined that based on the VE's

testimony, there were sufficient jobs in the national economy that Mr. Walgren could perform,

and thus that he was not disabled (R. 36-37).

**D.**

After the ALJ's decision, Mr. Walgren appealed and submitted the following evidence

for the period October 2010 to February 2011 (R. 8). On October 25, 2010, he was taken by

ambulance to the hospital after his family observed him having five to six seizures, each lasting

five to seven minutes (R. 646). Trauma was reported to his tongue but there was no obvious

active bleeding (R. 60). His family reported that his last seizure was a week before, but he did

not seek medical attention (*Id.*). An EEG did not show seizure activity conclusively, and a CT

scan of his brain was normal (R. 55, 58). Lab results showed "a rather subtherapeutic dose" of

Trileptal and Topamax (R. 647), but Mr. Walgren denied missing his medications (R. 57). He tested positive for benzodiazepines (anti-anxiety/depression medication) and cannabinoids (marijuana), despite denying having done drugs or smoking recently (R. 58). A cocaine and PCP screen were negative (R. 61). The attending doctor discontinued Trileptal and Topamax, maintained Mr. Walgren's third medication, Lamictal, and prescribed a new anti-seizure medication, Dilantin (R. 59). The doctor opined that Mr. Walgren had a low seizure threshold, and the doctor questioned his compliance with medication (R. 61).

On November 9, 2010, neurologist Dr. Yevgenyaa Kaydanova reviewed Mr. Walgren's epilepsy drug history, and opined that his seizures were "[m]ost likely resistant" to medication (R. 635). Dr. Kaydanova increased Mr. Walgren's dosage of Trileptal (which he found was not prescribed at an optimum level by Dr. Vern), continued his current dosage of Lamictal, and prescribed Ativan to prevent cluster seizures (*Id.*). A December 3, 2010 MRI of Mr. Walgren's brain was "unremarkable" (R. 638), but an EEG from that day "revealed rare sharp waves on the left anterior temporal area indicating the presence of relatively inactive discharging focus within that region. In addition a mild to moderate degree of slow wave abnormality were seen on the left temporal and frontal regions indicating some cerebral dysfunction on both areas" (R. 620).

On December 19, 2010, Mr. Walgren was again hospitalized after having a complex partial seizure followed by a partial seizure with secondary generalization (*i.e.*, a spreading of the partial seizure to the rest of the brain) a few hours later (R. 629). Mr. Walgren was initially postictal,[5] but the seizure "self-resolved" a few hours later (*Id.*). His neurologist, Dr. Jeannie Rhee, opined that Mr. Walgren's epilepsy was "relatively medically refractive [sp.]" (*i.e.*,

---

[5]Postictal refers to a person's state after experiencing a seizure.

resistant to medication) (*Id.*).[6] She maintained his two anti-seizure medications, Trileptal and Lamictal, but determined that a third medication would not decrease the frequency of Mr. Walgren's seizures (*Id.*). Dr. Rhee instead sought to control what she saw as an exacerbating factor to his seizures – sleep deprivation – and prescribed Ambien (*Id.*).

On January 25, 2011, Dr. Kaydanova reviewed Mr. Walgren's self-reported seizure calendar, which showed that since November 2010, he had experienced approximately two "auras," or complex partial seizures, each week (R. 622). Mr. Walgren was also seen by his psychiatrist that day, who increased his prescription for Zoloft to 100 milligrams daily and gave him Trazodone for sleep because Ambien was ineffective (R. 621).

The last medical records submitted to the Appeals Council were dated February 17, 2011, when Mr. Walgren's parents called an ambulance after his third seizure that day (R. 649). The fire department found him lying on the floor postictal from a seizure, with no visible oral or physical injury (R. 649-50). He was admitted to the hospital for 23 hours observation (R. 650).

### E.

On June 15, 2012, the Appeals Council issued its decision, after considering the additional evidence received from Mr. Walgren (R. 4). The Appeals Council upheld the ALJ's determination at Steps 1, 2, and 3, and adopted the ALJ's ultimate conclusion that Mr. Walgren was not disabled (*Id.*). The Appeals Council also considered Mr. Walgren's subjective complaints and agreed with the ALJ that he was "not fully credible" (R. 5-6).

However, the Appeals Council did not agree with the ALJ's RFC finding (R. 4). The Appeals Council found that the hearing decision limiting Mr. Walgren to light work that was simple and unskilled with limited contact with the public, co-workers and supervisors "does not

---

[6] "Refractory epilepsy" means that medicines do not work well, or at all, to control epileptic seizures. *See* http://www.hopkinsmedicine.org/healthlibrary/conditions/nervous_system_disorders/refractoryepilepsy.

describe the extent of the claimant's social limitations, nor does it adequately account for moderate deficits in concentration persistence, or pace" (R. 5). Instead, the Appeals Council adopted the mental and social limitations set forth in the ALJ's hypothetical question posed at the hearing to the VE that limited Mr. Walgren's RFC to "short, simple instructions, brief and superficial contact with coworkers, and only incidental public contact," as well as no more than one contact with a supervisor per hour, with no micromanaging (*Id.*). In addition, the Appeals Council limited Mr. Walgren's RFC to "only routine work stress not involving high production goals," and kept the ALJ's limitation that Mr. Walgren be precluded from working around dangerous machinery or unprotected heights (R. 5-6).

The Appeals Council stated that they considered the expert medical opinions of the medical consultants and gave weight to those opinions insofar as they were consistent with the objective medical evidence and the Appeals Council's decision (R. 5). The Appeals Council also relied on the VE's testimony that under the revised RFC, Mr. Walgren could perform a reduced range of light work of which there were a significant number of jobs in the national economy, including housekeeping, mailroom clerk, or office helper (R. 5-6). Thus, the Appeals Council agreed with the ALJ that Mr. Walgren was not disabled as defined in the Social Security Act (R. 6).

### III.

We will uphold the Commissioner's decision that a claimant is not disabled if it is supported by "substantial evidence," meaning "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009). "The ALJ is not required to address every piece of evidence or testimony presented, but must provide 'an accurate and logical bridge' between the evidence and h[is] conclusion that a

claimant is not disabled." *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012) (quoting *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)). "[I]n so doing, he may not ignore entire lines of contrary evidence." *Arnett v. Astrue*, 676 F.3d 586, 591-92 (7th Cir. 2012).

Here, Mr. Walgren argues that the Commissioner's decision should be reversed and remanded for failing to properly evaluate: his seizures under the Listings at Step 3; the medical opinion of his treating specialist, Dr. Vern; and his credibility (doc. # 19: Pl.'s Mem. at 1). In addition, plaintiff argues that the Appeals Council failed to properly evaluate new and material evidence (*Id.*). We agree that these errors require remand.

### A.

As the Appeals Council's final decision adopted the ALJ's Steps 1, 2, and 3 findings, we review the ALJ's opinion at these steps to see if they were supported by substantial evidence. Before assessing the propriety of the ALJ's Step 3 determination, however, we must take a step back to understand what, exactly, the ALJ determined as to Mr. Walgren's seizures. At Step 2, the ALJ stated that Mr. Walgren "has not alleged that he has any severe physical impairments" (R. 34). This, of course, is incorrect, as Mr. Walgren has consistently alleged throughout this case that he has a disabling seizure disorder. Seizure disorders are physical impairments that are analyzed under the Listings for epilepsy, Listings 11.02 (convulsive epilepsy) and 11.03 (non-convulsive epilepsy). *See, e.g., Rodriguez v. Astrue*, No. 11 C 5637, 2012 WL 5995738, at *13-14 (N.D. Ill. Nov. 30, 2012); *Wilson v. Astrue*, No. 11 C 7807, 2012 WL 3961296, at *6 (N.D. Ill. Sep. 10, 2010).

Instead, the ALJ found that Mr. Walgren had a severe "pseudo seizure disorder" (R. 30). The ALJ did not define this term in his opinion, but, at Step 3, the ALJ stated that "the claimant's

Psuedo-seizure disorder does not meet or medically equal the requirements of any listed impairments in Appendix 1" (R. 31).

Plaintiff argues that the ALJ's Step 3 determination as to his physical impairments was "devoid of analysis" and thus not supported by substantial evidence (Pl.'s Mem. at 11). We agree. Indeed, the ALJ did not consider Mr. Walgren's alleged physical impairment at Step 3, because at Step 2, the ALJ erroneously found that Mr. Walgren had not even alleged a physical impairment. In addition, as we explain below, the ALJ failed to adequately address the evidence that Mr. Walgren suffers from a seizure disorder.

Likewise, the Appeals Council did not mention any physical impairment. Though the Appeals Council stated that it considered the findings made by the DDS medical consultants in the case, the Appeals Council revised the ALJ's RFC determination only to account for Mr. Walgren's mental and social limitations. Thus, the Commissioner's failure to consider Mr. Walgren's alleged physical impairments at Step 2 requires remand.

Moreover, even if we were to assume that the ALJ actually considered, but rejected, Mr. Walgren's allegation that he suffered from a seizure disorder, the ALJ's analysis fell short. Summarily concluding at Step 2 that Mr. Walgren did not have a severe physical impairment did not absolve the ALJ from the requirement that he consider Mr. Walgren's severe *and* non-severe impairments in combination at Step 3. *See Arnett v. Astrue*, 676 F.3d 586, 590 (7th Cir. 2012). The Seventh Circuit has held that "[i]n considering whether a claimant's condition meets or equals a listed impairment, an ALJ must discuss the listing by name and offer more than a perfunctory analysis of the listing." *Kastner*, 697 F.3d at 647. The ALJ did not do so here. While the ALJ mentioned that Dr. McKenna considered Listings 11.02 and 11.03 regarding

epilepsy, the ALJ himself never analyzed the evidence in the context of these Listings or any other Listing for physical impairments. This is insufficient and requires remand.

**B.**

Furthermore, in finding that Mr. Walgren had a severe "pseudo seizure disorder," rather than a seizure disorder, the ALJ ignored the medical evidence of Mr. Walgren's convulsive and partial complex seizures and disregarded the opinion of Dr. Vern, Mr. Walgren's treating neurologist. In adopting the ALJ's Steps 1 through 3 findings and failing to address any of Mr. Walgren's physical limitations, the Appeals Council's final decision incorporated these errors.

Dr. McKenna, who testified at the hearing as a medical expert, was the only doctor in the record to use the term "pseudo seizure disorder." Dr. McKenna opined that Mr. Walgren was "having pseudo seizures and not real seizures," and that this condition was a "mental impairment" (R. 158). He testified that with a pseudo seizure disorder, Mr. Walgren essentially pretends to have seizures in order to be excused from social pressures, awkward situations, and other interpersonal problems (*see* R. 156, 162). Dr. McKenna further testified that individuals with a pseudo seizure disorder "don't injure themselves, because they do the dying swan routine and gently to the floor and make sure they don't injure themselves" (R. 159-60).

Dr. McKenna based his opinions on Mr. Walgren's testimony and the medical record; he did not examine Mr. Walgren. Dr. McKenna is an internist, with no expertise in neurology (R. 157). Moreover, internet research into the medical literature on "pseudo seizures" suggests that Dr. McKenna may have misapprehended the nature of this impairment. While the etiology of pseudo seizures – referred to as "psychogenic non-epileptic seizures" or "PNES" in medical literature to avoid the "pejorative connotation" of "pseudo seizures" – is different than that of epileptic seizures, their physical manifestations can be as bad or worse than epileptic seizures.

*See* W. Curt LaFrance, Jr., M.D., M.P.H., *Psychogenic nonepileptic "seizures" or attacks"? It's Not Just Semantics: Seizures*, 75(1): 87-88 Neurology (July 6, 2010), http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2906405/. PNES "are not the result of the abnormal electrical discharges in the brain that characterize epilepsy, but instead appear to be stress-related behaviors that mimic and are misdiagnosed as the neurological disorder." *See* "Symptoms That Mimic Epilepsy Linked to Stress, Poor Coping Skills" (April 2012), http://www.hopkinsmedicine.org/news/media/releases.

PNES can be characterized by "sudden, involuntary seizure-like attacks . . . PNES presenting symptoms involve a wide array of nervous system functions, including changes in behavior, motor activity, sensation, cognitive, and autonomic functions." Gaston Baslet, *Psychogenic nonepileptic seizures: a treatment review. What have we learned since the beginning of the millennium?*, 8: 585–598 Neuropsychiatric Disease and Treatment (Dec. 2012), http://www.ncbi.nlm.nih.gov/pmc/articles/PMC3523560. A patient with PNES may "unconsciously convert[] emotional dysfunction into physical symptoms. . . . In some cases, those afflicted have become paralyzed or blind because of emotional trauma." *See supra*, "Symptoms That Mimic Epilepsy Linked to Stress, Poor Coping Skills." PNES attacks "look like epileptic seizures," including "involuntary episodes of movement, sensation, or behaviors (*e.g.*, vocalizations, crying, other expressions of emotion) . . ." Taoufik M. Alsaadi, M.D., and Anna Vinter Marquez, M.D., *Psychogenic Nonepileptic Seizures*, Am. Family Physician, 72(5):849-856 (Sept. 1, 2005), http://www.aafp.org/afp/2005/0901/p849.html. "Indeed, compared with patients with true epilepsy, patients with psychogenic seizures exhibit more frequent, severe, and disabling seizures as well as a poorer quality of life." A. Krumholz, J.

Hopp, *Psychogenic (nonepileptic) seizures*, Seminars in Neurology, 26(3):341-50 (July 2006), http://www.ncbi.nlm.nih.gov/pubmed/16791780.

In concluding that Mr. Walgren suffers from "pseudo seizures" (a term that does not appear to be of current usage), Dr. McKenna failed to address any of this literature which indicates that PNES are involuntary and may physically resemble epileptic seizures and the functional limitations they create. To the contrary, Dr. McKenna's testimony suggests the view that pseudo seizures (1) are voluntary, as they bring to the individual who has them "social gains" (R. 156), and (2) do not involve uncontrolled or severe physical manifestations, because people who have them "don't injure themselves, because they do the dying swan routine and [go down] gently to the floor and make sure they don't injure themselves" (R. 159-60).

We recognize that, despite Dr. McKenna's testimony, the ALJ did include physical functional limitations in the RFC – precluding Mr. Walgren from working around dangerous machinery or unprotected heights (R. 31). However, the inclusion of that limitation in the RFC does not salvage the ALJ's decision at Step 3 to disregard the medical evidence of seizures in the record and Dr. Vern's opinions.

"A treating physician's medical opinion is entitled to controlling weight if it is well supported by objective medical evidence and consistent with other substantial evidence in the record." *Roddy v. Astrue*, 705 F.3d 631, 636-37 (7th Cir. 2013)). If the ALJ does not give a treating physician's opinion controlling weight, he must give a sound reason for rejecting it. *Id.* "Moreover, '[e]ven if an ALJ gives good reasons for not giving controlling weight to a treating physician's opinion, [ ]he has to decide what weight to give that opinion,' considering 'the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and support for the physician's

opinion.'" *Wood v. Astrue*, No. 12 C 3515, 2013 WL 1154461, at *7 (N.D. Ill. Mar. 18, 2013) (quoting *Campbell v. Astrue*, 627 F.3d 299, 308 (7th Cir. 2010)).

Here, the ALJ failed to explain what weight, if any, he assigned to Dr. Vern's opinions, and the ALJ failed to provide a sound reason for not giving Dr. Vern's opinions controlling weight. The ALJ noted the findings in Dr. Vern's RFC opinion and found that they were inconsistent with Dr. McKenna's findings at the hearing and other evidence in the record (R. 34).[7] But, the ALJ did not give a sound reason for rejecting Dr. Vern's opinion in favor of Dr. McKenna's opinion. Unlike Dr. McKenna, Dr. Vern was a neurologist; the ALJ briefly noted Dr. Vern's specialty but provided no discussion of the weight this merited (*Id.*). In addition, though the ALJ discussed the length and extent of Dr. Vern's treating relationship with Mr. Walgren, his discussion was factually inaccurate. The ALJ disputed Dr. Vern's note that he had been treating Mr. Walgren since December 2006, instead stating that Dr. Vern treated Mr. Walgren from 2008 through 2010 (*Id.*). This, as shown in the review of the record above, was error: Dr. Vern began treating Mr. Walgren in 2006 (R. 386).

Furthermore, several of the reasons the ALJ gave for giving "diminish[ed]" weight to the opinions of Drs. Becker and Vern are unfounded. *First*, the ALJ stated that "there is no single incident of a witnessed seizure in the record," by either a medical professional or family member (*Id.*). That finding is simply wrong. At least one medical professional witnessed plaintiff's seizures prior to the hearing. In 2006, a nurse observed Mr. Walgren having multiple "episodes" (R. 400). Perhaps the ALJ concluded that this observation was unreliable because Mr. Walgren also tested positive for cocaine on that hospital visit (R. 402). But, the ALJ did not say this was

---

[7]Neither the ALJ, nor the parties, mentioned that in his RFC opinion, Dr. Vern stated that Mr. Walgren could perform low-stress jobs, albeit with an unspecified number of breaks. As the ultimate decision as to disability lies with the Commissioner, this omission does not alter the analysis in the Court's opinion. *See, e.g.*, *Denton v. Astrue*, 596 F.3d 419, 424 (7th Cir. 2010).

the case. Moreover, Mr. Walgren's parents and fiancée stated on multiple occasions that they witnessed his seizures – both convulsive and partial complex (*see, e.g.*, R. 320, 360, 399, 406). The ALJ did not address that testimony, and did not explain why the first-hand observations of those witnesses were not credible. An ALJ cannot build a logical bridge between the evidence and his conclusions simply by ignoring evidence that does not fit with his conclusions. *Perkins v. Astrue*, 498 Fed. App'x 641, 643 (7th Cir. 2013).

*Second*, the ALJ stated that the record does not document that Mr. Walgren was hospitalized for treatment of his alleged seizures (R. 33). This finding, too, was incorrect. Emergency room records show that Mr. Walgren was taken to the hospital in 2003 and 2006 after suffering from convulsive seizures (R. 103, 396), and in May 2009, Dr. Vern reported that Mr. Walgren had been hospitalized for a convulsive seizure two weeks prior (R. 613).

*Third*, the ALJ stated that Mr. Walgren "was found to have non-therapeutic levels of his seizures medications when tested" (R. 35). The record shows that on at least one occasion, Mr. Walgren appeared to have non-therapeutic levels of some of his seizure medications when tested. However, the ALJ did not consider that Mr. Walgren maintained therapeutic levels of his other anti-seizure medications (which he had been taking for approximately seven years) and that his doctor was constantly adjusting his medication levels to try to control his seizures and to control his side effects from the medication.

In sum, the ALJ not only failed to build the required bridge between the evidence and his findings about Mr. Walgren's seizure disorder, but in so doing, he failed to address or misstated important evidence. These errors (and the Appeals Council's adoption of them by endorsing the ALJ's decision at Steps 1 through 3) require remand here. *See Arnett*, 676 F.3d at 592-93 (remanding case where ALJ ignored entire lines of evidence by failing to take into account

several of the claimant's diagnosed physical impairments); *see also Terry*, 580 F.3d at 477-78 (remanding case where ALJ repeatedly mischaracterized the record in identifying purported "inconsistencies" in the claimant's testimony); *Hill v. Astrue*, 295 F. App'x 77, 82 (7th Cir. 2008) (remanding case where ALJ's misstatement of the claimant's testimony failed to support ALJ's decision by substantial evidence).

## C.

As we have explained above, the Appeals Council left unchanged the ALJ's determination at Steps 1 through 3 (R. 5-6). The Appeals Council stated that in so doing, it considered the following additional evidence submitted by Mr. Walgren: (1) hospital reports from October 25, 2010, when Mr. Walgren was taken by ambulance to the hospital after his family observed him having five to six seizures; (2) a November 9, 2010 opinion by neurologist Dr. Kaydanova that Mr. Walgren's seizures were "[m]ost likely resistant" to medication; (3) a December 19, 2010 report from Mr. Walgren's neurologist, Dr. Jeannie Rhee, stating that he was again hospitalized after having two breakthrough seizures (a complex partial seizure followed by a partial seizure with secondary generalization) and opining that Mr. Walgren's epilepsy was resistant to medication; (4) a January 25, 2011 report from Dr. Kaydanova indicating that Mr. Walgren's seizure calendar showed that he had experienced approximately two complex partial seizures each week since November 2010; and (5) hospital reports from February 17, 2011, stating that the fire department found Mr. Walgren postictal on the floor after his third seizure that day.

Although the Appeals Council adjusted Mr. Walgren's RFC to account for additional social and mental limitations, the Appeals Council did not explain why this additional evidence failed to warrant any revision of the ALJ's determination at Steps 1, 2, and 3. Nor did the

Appeals Council explain why the new evidence did not warrant any additional physical limitations in the RFC. Despite the new and material evidence pointing to a seizure disorder – including the second medical professional in the record to witness Mr. Walgren in a postictal state – the Appeals Council did not address any physical impairment.

Moreover, in adopting the ALJ's conclusion that Mr. Walgren's subjective complaints were "not fully credible" (*see* R. 5-6), the Appeals Council ignored the new evidence from Mr. Walgren's neurologists, Drs. Kaydanova and Rhee, that Mr. Walgren's seizures were likely resistant to medications. This evidence calls into question the ALJ's finding that Mr. Walgren was not credible when testifying about his seizures because he was not compliant with his medications.

## CONCLUSION

For the forgoing reasons, this Court grants plaintiff's request for remand (doc. # 19), denies the Commissioner's motion (doc. # 29), and remands the case for proceedings consistent with this opinion.

ENTER:

**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

DATE: August 29, 2013